Filed 8/31/20  P. v. Polk CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C080915 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F01842) |
| v. | |
| ERNEST JAMAL POLK, | |
| Defendant and Appellant. | |

Two Sacramento County Sheriff's Department Gang Unit detectives encountered defendant, a validated member of the East Side Piru criminal street gang, and a woman standing in front of a house in Rancho Cordova at night.  Defendant had a loaded handgun in his possession and was subsequently found to have three baggies, two containing methamphetamine and one containing heroin.  A jury found defendant guilty

of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1)),[1] unlawful possession of heroin for sale (Health & Saf. Code, § 11351), unlawful possession of heroin and methamphetamine while armed with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a)), and possession of methamphetamine for sale (Health & Saf. Code, § 11378).  The jury further found gang enhancement allegations (§ 186.22, subd. (b)(1)) to be true in connection with each count.  Defendant was sentenced to an aggregate term of seven years eight months.

On appeal, defendant asserts:  (1) the evidence was legally insufficient to support the gang enhancement allegation findings; (2) the trial court violated his Sixth Amendment confrontation clause rights in admitting certain testimony by the prosecution's gang expert; (3) the admission of marginally relevant and highly inflammatory gang evidence constituted "overkill" and violated his right to due process and a fair trial; (4) the trial court erred in failing to instruct the jury, sua sponte, with CALCRIM No. 1403 concerning the limited purpose of gang evidence, and, if the court had no sua sponte duty, defense counsel was constitutionally ineffective for failing to request that instruction; and (5) cumulative error deprived him of a fair trial.  Defendant also requests that we review in camera hearing minutes to determine whether the trial court abused its discretion in concluding that a gang detective validly claimed the privilege under Evidence Code sections 1040 and 1042.

We affirm.

---

[1]  Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

**Prosecution Evidence**

**Defendant's Arrest**

On March 24, 2015, at approximately 8:15 p.m., Detectives Kenny Shelton and Glen Barawed of the Sacramento County Sheriff's Department Gang Unit were in a known gang neighborhood in Rancho Cordova when they observed two people standing in front of a house. The house's porch light was off, and Barawed found it "unusual to see two people standing in front of a dark house." The detectives illuminated the area. Defendant was one of the people standing in front of the house, and the other person was a woman. Both Shelton and Barawed had numerous previous contacts with defendant. Barawed had previously validated defendant as a member of the East Side Pirus gang. In 2013, defendant told Barawed that he was an East Side Pirus member.

Barawed got out of the patrol vehicle, called defendant by his street name, PJ, and told defendant to come over to him. Defendant turned away and reached towards the waistband of his pants. The detectives both feared defendant might be armed, and they pointed their firearms at defendant and told him to get on the ground. Defendant did not immediately comply and Shelton called for backup. Eventually, defendant lay down on the ground. Barawed saw a black and silver handgun in defendant's right hand. Defendant "thrusted his right hand forward and kind of pushed the gun away from him" and underneath a brick planter. Barawed handcuffed defendant and lifted him off the ground, revealing a torn plastic baggie on the ground where defendant had been. Shelton recognized it as "a little piece of cellophane wrapping underneath where his body was, what we call a tear-off, which is indicative of narcotic sales." Law enforcement also recovered the handgun, a loaded Ruger nine-millimeter semiautomatic with a round in the chamber.

Detective Ralph Garcia searched the area and found a cell phone on a walkway next to where defendant had been detained. When he picked up the phone, he observed

that the screen was prompting the user to confirm or cancel a full factory reset of the phone. Garcia canceled the factory reset.

As the detectives moved defendant to a vehicle, Shelton observed that defendant was wearing two memorial wristbands commonly worn by East Side Pirus gang members. The wristbands commemorated fellow gang members who had been the victims of a triple homicide in 2011.

**Search of Defendant's Home**

Following defendant's arrest, Shelton went to defendant's house where he participated in a search. As law enforcement approached the house, they saw two validated East Side Pirus members outside along with the woman who had been with defendant when he was arrested no more than 30 minutes earlier. Inside defendant's house, Shelton found a Sacramento River Cats baseball cap of a type commonly worn by East Side Pirus because, to them, the "R" and "C" represent Rancho Cordova, and because red, the color of the writing, is a color commonly claimed by the gang. "Bolo" was written on the side of the hat, representing the Bolo block, "another East Side Piru set over in the Coloma Road corridor." "Rest in Peace, Lil' Bubba" was printed on the back of the hat, referring to one of the three 2011 homicide victims commemorated on the wristbands.

**Evidence of Possession of Controlled Substances for Sale**

When Barawed brought defendant to the jail, Barawed told custodial officers to have defendant strip-searched. Deputy Greg Ma was present during the search and testified that "there was a couple baggies of narcotics that were located on [defendant's] person." One small baggie containing 0.2 grams of methamphetamine was found in defendant's sock and another baggie containing 12 and a half grams of methamphetamine was found in defendant's underwear. Another baggie containing five and a half grams of heroin was also found in defendant's underwear.

4

Detective Darryl Meadows testified as an expert in the sale of methamphetamine and heroin. Meadows testified that 11.5 grams of methamphetamine would constitute approximately 115 doses and .2 grams would constitute approximately two and a half doses. Meadows testified that 4.85 grams of heroin would constitute 48 and a half doses.[2]

Meadows also discussed several text messages downloaded from the cell phone recovered from the arrest site. One text message read: "Awesome. I'm going to need that .2 .3 for me, then a 15 for a co-worker. So like . . . .4 .5 altogether. And I owe you 20 tomorrow. Cool." Meadows testified that these amounts referred to amounts in grams, and that the reference to "owe you 20 tomorrow" referred to a "front where you give them the narcotic controlled substance, and then at some point later on, they basically pay you for it." Meadows testified that another of the text messages also discussed obtaining some narcotic with the agreement that the supplier would be paid later. Another text message read, "I got a knock from Placerville who is on his way to work. Wants 80 dollars worth of white, and I don't got it. Want to make 80 dollars, answer your phone."[3] Another text message read: "I need some Crys, and I got some stupid boy who has been up for five days, being unbelievably disrespectful, and I need you, please."[4]

---

[2] The parties stipulated that a criminalist at the Sacramento County Crime Lab analyzed three items in a controlled substance envelope. Item 001-GB-2 contained 11.5 grams of methamphetamine. Item 001-GB-3 contained .25 grams of methamphetamine. Item 001-GB-4 contained 4.85 grams of heroin.

[3] Meadows testified that a "knock" is a street term for "somebody is basically going to call or come by, and they want to purchase a narcotic." He testified that "white" could refer to cocaine or methamphetamine.

[4] Meadows testified that "Crys" referred to crystal methamphetamine.

The prosecutor asked Meadows a hypothetical question about an individual discovered in possession of a loaded firearm and a baggie with the corners torn off, who was ultimately found to be in possession of baggies matching those found on defendant, and who had text messages on his phone like those discovered on the phone found near defendant. Meadows testified that, in his opinion, the individual would be possessing the narcotics for the purpose of sales rather than personal use. Meadows's opinion was "[b]ased on the overall circumstance and the sheer amount of the narcotics."

**Jail Cell Search Evidence**

Deputy Joshua Langensiepen worked at the Rio Cosumnes Correction Center (RCCC). On October 7, 2015, he searched the cell shared by defendant and John Sanford. Langensiepen found a number of gang related items in the search. In defendant's property box, Langensiepen found, among other things, shower shoes with the number 21 on one shoe and 00 on the other. He also found a birthday card which said: "happy B day, and then underneath the cake, finished with Piru, and then located on the cake itself, it's going to have candles 2100," and on the other side said "big hommie PJ" from AG.

Shelton, who testified as an expert in African-American gangs, specifically East Side Pirus, testified that "2100" on the shower shoes and the birthday card was a reference to West La Loma, a subset of the East Side Pirus. The "jail made birthday card" indicated that its recipient was an East Side Piru from West La Loma.

**Jail Phone Conversations**

The prosecutor played a number of recorded jail phone call conversations for the jury. In a conversation on April 21, 2015, defendant stated, "I'm top dog on the yard. I'm head honcho around (unintelligible)." Shelton testified that someone making such a statement was saying "that they are the one running the housing area that they are at, or that they are an influential person in that particular housing area."

6

In a phone conversation on April 22, 2015, defendant stated, "in here I be bullying people 'cause I have to." Defendant stated, "they can't fuck with me. They can't fuck with me in here." Asked if he was only with people from "West Block," defendant stated, "No. Me and my brothers from West La Loma, and we don't fuck with nobody else in here. We just be talking shit." He continued, "we got two Oak Park homies. And we just fuck with them two. So it's really like four of us, you know what I mean, in the pack and that's it. We be cussing everybody out, talking all this shit." Defendant stated, "it's approximately 150 guys, so between the 4 of us and 150 guys, we go hella hard." He also stated, "I be sending crash dummies to the phone too when I get bored." Shelton testified that crash dummies is a street term for "a very low level individual," a "peon or a pawn," "[s]omeone who is expendable, trying to make their way up. Somebody they can manipulate."

In a conversation on April 25, 2015, defendant and an identified male discussed a particular individual, referring to him as deceitful and a liar. Defendant asked, "[h]e not programming, right, bro?" Defendant stated that "he trying to double-dutch," and further stated, "I'mma beat that nigga up though when I come home," and "I'm, I'm for sure beating that nigga up." According to Shelton, the individual they were discussing was a validated East Side Piru. Shelton testified that if someone was referred to as not programming right, that "means they are not representing the gang the way they are supposed to be. They are -- basically, they are losing respect . . . ." Shelton further testified that someone who is not "programming right" can be assaulted or "removed." In the same phone conversation, defendant told the person with whom he was speaking to "put like uh, maybe some more money on the horn for us, (unintelligible)."

In a phone conversation on April 26, 2015, defendant told an unidentified female, "I feel like my whole empire is crumbling." The unidentified female responded, "No, well, it is because you've built it on some faulty bitches. You didn't keep them right, the right one there. Otherwise they wouldn't have fallen because you wouldn't have been

7

there with all that shit on you like, because you know I wouldn't have let you leave the house like that." Defendant also stated, "I also got a mystery biggie. I know where that came from. That came from Fat.[5] I talked to him. He had $4 on the phone; I talked to him." The person with whom defendant was speaking responded, "He told me he had put money on the phone for you." Defendant responded, "Yeah. I talked to him one time and, and as soon as I talked to him, he said, uh, he's ordering me another one immediately. You feel me? Um, so if that doesn't come, I'm waiting on you and Mom next week."

In a May 14, 2015, phone conversation, defendant again talked about the same East Side Piru "not programming right whatsoever . . . ." Defendant stated, "I don't need that around me, dog. You feel me? That nigga killing my infrastructure, dog." Asked what he understood this statement to mean, Shelton opined, "one, that [defendant] is somebody of status because it's his infrastructure that he is messing with. [¶] And, two, that [the gang member being discussed] is not acting the way he is supposed to, again, not bringing the prestige that is supposed to be brought on the neighborhood -- on the gang."

In a May 28, 2015, phone conversation, defendant referred to having "a full-on West La Loma meetin' on West Loma with all of my uh, my little partners . . . ." Shelton testified that typically, a gang member would have to be "of some level of influence" to organize a meeting. "It's not usually going to be this younger person that come up, organizing something like that. Usually it's somebody in charge of that sort of thing." Shelton testified that, on this call, defendant was "talking about holding a West La Loma meeting, so he's not talking about attending one. He's talking about holding one, organizing one, which leads me to believe he is of higher stature. [¶] Secondly, he refers to West La Loma, which leads me to believe he has high stature within the West La

---

5 Shelton testified that Fat or Fats is "Stefan Poe who is another older East Side Piru. He is one of the original Chedda Boyz . . . ," a precursor to the West La Loma subset.

Loma subset of the East Side Pirus.  And then lastly, he refers to his little partners, so he's talking about the people who are under him, who are attending the meeting."

In a May 31, 2015, phone conversation, defendant, again referring to the same East Side Piru gang member, stated, "we about to cut that nigga off.  We about to take that nigga off the set.  If he woulda have came in our pod, that nigga was off."  Shelton testified that to take someone off the set means removing someone from a gang.  After an unidentified male on the phone stated, "Air it out, bro.  Tell him," defendant responded, "Air It Out Republic."  Defendant later said, "put that on mir, bitch.  Put that on little republic," and "I'm putting that on mir."  Shelton testified that "air it out" is a street term usually meaning to do a shooting.  Shelton testified that "put that on mir" and "air it out republic" both meant the same thing, to do a shooting.[6]

In a June 9, 2015, phone conversation, defendant discussed younger people, and stated, "I have to steer the ship from the back," and "I have to guide them in, in, into what they should be doin' . . . ."  He said that "[a] lot of these people is uh, man, they lost," and later stated, "I kinda look at 'em and sometimes I laugh.  I get a laugh out of 'em.  And most of the time I just watch 'em.  If it don't pertain to me, Maine, or Piglet uh it's under my bridge."

In a June 20, 2015, phone conversation, an unidentified female said to defendant, "there's so many of you guys out here that's locked up doing some time right now."  She later said, "[t]here's gotta be someone at the house with some weight, and power and pull and shit.  Delbert's not there.  You're not there."  To Shelton, this indicated that defendant was someone with a significant amount of weight.  She then said, "[a]ll the big key players are locked up," and defendant responded, "I mean, we are not players like

---

[6] "Mir" in these statements referred to Jamir Miller, an East Side Piru who had been killed, and to put something "on Mir" was to do something in his honor.

9

that." Shelton testified that the woman's reference to big key players meant influential individuals from the West La Loma subset.

In a July 3, 2015, call, defendant stated, "Yeah. I'm like, see, when I was at home - this what I told 'em, straight up. When I was at home, y'all didn't have to worry about this. Wasn't none of that going on." He further stated, "So they was like, so Polk, you patrol the streets? I say, you might as well say that I do. You might as well . . . ." He continued, " . . . say that I do. So you keep the peace, huh, Polk? Yes, I do."

In a July 7, 2015, phone conversation, defendant stated, "[y]ou need to start putting up fucking PJ fund, collecting fucking a PJ fund." The unidentified female to whom defendant was speaking stated that no one had any money, and no one "shows up." The following exchange ensued:

"[DEFENDANT]: Why is everybody broke? Where is everybody?

"[UNIDENTIFIED FEMALE]: Good question. (Unintelligible).

"[DEFENDANT]: What?

"[UNIDENTIFIED FEMALE]: You should ask the boys that question. There's nobody around PJ. Everybody's gone.

"[DEFENDANT]: I can put you on. I could put you on from right here but I don't want you selling work.

"[UNIDENTIFIED FEMALE]: I already do.

"[UNIDENTIFIED FEMALE]: How do you think we're hustling (Unintelligible) Whispering.

"[DEFENDANT]: What weed?

"[UNIDENTIFIED FEMALE]: No.

"[DEFENDANT]: Probably just give it to George so he'll do something for us.

"[UNIDENTIFIED FEMALE]: No. No, we're talking I sell (Unintelligible).

"[DEFENDANT] Wait, my knocks?

Laughing.

10

"[UNIDENTIFIED FEMALE]: (Unintelligible) she has a purse around her neck and . . .

"[DEFENDANT]: Shut up.

"[UNIDENTIFIED FEMALE]: You think I'm bull shitting you?

"[DEFENDANT]: Yes.

"[UNIDENTIFIED FEMALE]: (Unintelligible).

"[DEFENDANT]: My knocks though.

"[UNIDENTIFIED FEMALE]: Some of them. Yes. (unintelligible)."

Shelton testified that the reference to a "PJ fund" referred to the "gang as a whole supporting incarcerated gang members."

In a July 8, 2015, phone conversation, defendant stated, "they got me in like uh, a lot of like associates paperwork like, like I'm the head of a cartel or something." The unidentified female defendant was speaking with said, "Maybe you were the head of the cartel," and then said, "You're the head of the West Block." Defendant responded, "Sh-, girl, be quiet, girl. Dang, girl. Yeah. Man, that's what they're trying to say. That's what they're trying to - you feel me?"

In a September 2, 2015, phone conversation, an unidentified female told defendant, "[t]hey shot up the house," and indicated that there were 23 shots. Defendant stated, "Yeah. None of that be going on if I was home," and "[n]one of that would be happening if I was there." According to Shelton, this shooting occurred within 24 hours of a shooting in a Varrio Eastside Norteño neighborhood in which the target was a Norteño trap house.[7] Shelton testified, "That tells me that [defendant] has some level of influence on what happens out on the streets. Whether it's because of his ability to

_____

[7] Sheldon explained that a trap house is a "gang hangout location, where gang members congregate. Oftentimes doing drug deals, things of that nature, but a general way of explaining [it] would be a gang hangout."

retaliate and people fear him, or whether it's because of his position within the gang and ability to mediate between the sets. I don't know which, but it does tell me that he has the ability to deter while he's out on the streets."

**Section 186.22 Gang Expert Testimony and Opinion**

As part of his job, Shelton has spoken with "thousands" of gang members, including approximately 50 East Side Pirus, as well as other officers and detectives concerning their knowledge of gangs and how gangs operate. He also reviewed reports made in his office, reports from other agencies, and other gang literature. He also reviewed field contact records, which recorded contacts between law enforcement and gang members as well as people in gang neighborhoods.

Shelton testified concerning his knowledge of the East Side Piru gang and the gang's primary subsets, including the West La Loma subset. Shelton testified that there were approximately 360 documented East Side Pirus, approximately 100 of whom were active. The primary colors associated with the gang were Blood colors, red and sometimes burgundy.

Shelton explained that the East Side Pirus were involved in an active "beef" with the Varrio Eastside Norteños, which involved "a large number of shootings." He discussed the origin of this conflict, which was ongoing between 2012 and 2015, and was "heaviest" towards the end of 2014 and the beginning of 2015. Shelton testified that this conflict would generally require members of both gangs to be armed.

Shelton continued: "Gang members, especially during a time of an active gang war or a beef as we call it, there are several expectations placed on that gang member. [¶] One, that gang member has to be able to protect themself. [*sic*] There is a completely rival gang who is going to do harm to that gang member, and that gang member needs to be prepared to protect himself, or more importantly protect his fellow gang members. [¶] Two, that gang member is expected to be able to protect his neighborhood, his turf, his street, whatever the case may be. So gang members will oftentimes patrol these streets

12

with firearms to make sure that everything is quiet, to make sure that there aren't any rival gangs coming through their hood to do any violence on them. [¶] And then lastly, to inflict violence on the gang, on their opposing gang. It establishes a particularly large amount of respect on the individual and the gang as a whole when an individual gang member carries a firearm and then takes it out and commits a violent crime against an opposing gang."

Shelton testified that the East Side Pirus' "gang objectives" were to make money, establish respect, and represent their gang and their neighborhood. He further testified, "They have kind of a money making mentality. You see this when we are looking at the actions that they do. Whether it's narcotic sales, robberies, pimping and pandering, things of that nature."

According to Shelton, the primary activities of the East Side Piru gang included possession and sale of narcotics, controlled substances, and marijuana, robbery, assault with a deadly weapon and firearms and weapons-related offenses. The area where defendant was arrested is controlled by the East Side Piru gang, and specifically by the West La Loma subset.

Shelton testified defendant had previously been validated as an East Side Piru on two or three occasions dating back to 2007. Detectives again validated defendant on the night of his arrest, and he was subsequently validated while in custody. He had a number of East Side Piru tattoos including a "P" standing for Piru and a "W" standing for West La Loma. He also had a tattoo that said "Chedda Boyz." Chedda Boyz was the precursor to West La Loma. Defendant had a Facebook page, open to the public, which depicted and discussed gang-related activities. Shelton testified it was common for gang members to intentionally leave their social networking profiles open to the public and post gang-related photographs to bring credit and respect to their gang from "the greatest number of people possible." Defendant's phone and Facebook page had photos of fellow gang members and he appeared in a number of photographs depicting East Side Piru activities.

13

He had no fewer than 21 contacts with law enforcement between 2010 and 2015 in East Side Piru neighborhoods in the company of other known or validated East Side Pirus.

In opining that defendant was an active member of the East Side Pirus, Shelton also took into consideration defendant's conduct since he had been incarcerated. One report completed at RCCC stated that defendant and another validated East Side Piru were stealing from other inmates and "ordering them or having them assaulted." Defendant was involved in a jail fight in which numerous individuals acting in concert assaulted another individual. Four or five of the assailants were validated East Side Pirus. Additionally, a number of the e-mails defendant received in jail contained East Side Piru terms. Several of the e-mails were sent by validated East Side Piru members.

Shelton opined that defendant was "in the upper echelon of the East Side Pirus, especially the West L[a] Loma subset." Shelton based his opinion on his "observations of the gang" and "on how individuals talk about other gang members, their arrest history, how active they've been, how often they have been contacted. How other people see them, how other people view them. How other people make reference to them, and how they make reference to themselves."

Shelton testified that, as a general rule, criminal activity conducted by one East Side Piru gang member benefits the gang as a whole. Shelton testified that "gang members are . . . ambassadors of their gang. Everything they do reflect[s] on their gang as a whole." Shelton continued: "So, if a particular gang member is out there, and he's doing what he's supposed to do by gang standards, he's representing his gang. He's making money. He's committing crimes to further the gang or whatever the case may be, that reflects positively on his gang as a whole as well as himself. [¶] It's going to enhance his own standing within the gang, and it's going to enhance his gang standing within the neighborhood. It's going to make ally gang members want to continue being their allies. It's going to make enemy gangs less likely to violently refuse or fight his gang. [¶] And oftentimes, it's going to make the public, the community less likely to

14

rise against the gang, to resist the gang because they see what the gang is capable of." Shelton testified that "[e]verything that the individual does is going to represent what the gang does and vice versa." Particularly regarding an "upper echelon" gang member like defendant, Shelton testified, "[i]f you have a gang member who is well known within the gang, well known by members outside of a gang, well known within the community, everything he does is going to have greater weight to how the gang is perceived compared to say a youngster who hasn't been around in the gang very long."

The prosecutor asked about the ways money made on the street by gang members is funneled back to the gang. Shelton explained: "There's a number of ways. [¶] . . . [¶] [O]ne example would be a Piru who makes money off narcotic sales would purchase more narcotics and . . . give some to another gang member in order for him to make money as well. [¶] Another example would be purchase of firearms on the streets to commit crimes. And another way as is referenced in [an email[8]] is by supporting incarcerated members. When you are incarcerated, your ability to make money is very limited, so you kind of rely on outside sources, particularly members of the gang." Shelton testified that the gang's ability to support incarcerated gang members had been diminished because of recent law enforcement activities.

Shelton testified that, to sell narcotics where defendant was arrested, "[y]ou have to be an East Side Piru or at least be blessed by East Side Piru. For example, a very close ally or associate of the East Side Pirus." Asked what he based his opinion on, Shelton responded, "Gangs -- speaking with numerous gang members, revealing numerous reports, including homicide reports, where East Side Pirus committed a murder or attempted murder for individuals who are selling narcotics within their neighborhood."

---

[8] The email Shelton testified about is one written by an East Side Piru gang member to Jermaine Edwards, another East Side Piru. The email was found in defendant's jail cell. We discuss this email in Part II.C.4., of the discussion, *post*.

15

Shelton testified that "for somebody else to come in and deal narcotics in the East Side Pirus' neighborhood without being a Piru, well, that's affecting their livelihood, that's affecting their ability to sustain their gang activity. And it's a major hit to their prestige to have somebody coming in. So for somebody else to come in, they would be assaulted likely, oftentimes violently assaulted." Shelton recounted an incident when two East Side Pirus shot a member of another gang who was selling narcotics in East Side Piru territory.

The prosecutor posed a hypothetical question to Shelton that closely tracked the facts of this case and asked whether Shelton had an opinion as to whether the individual described in the hypothetical committed the offenses described for the benefit of or in association with the East Side Piru criminal street gang. Shelton testified that his opinion would be that "it does."

Shelton testified his opinion was based on "several things" and explained: "One, you have a known documented East Side Piru member. In particular, a high ranking East Side Piru member dealing narcotics within a known gang neighborhood. Like I alluded to earlier, you cannot be from outside of a gang and sell in that neighborhood. You have to be either a Piru or have the blessings of the East Side Pirus in order to do that or risk getting killed. [¶] As I talked about earlier, the dealing of narcotics or illicit items by the gang has numerous benefits for the gang. [¶] One, like we just discussed with the jail calls, these all referenced to e-mails, it goes to support incarcerated gang members. They kind of look out for their own. [¶] Second, it establishes an individual's ability to make money for the gang and for himself; and thereby, bringing credibility, bringing respect, bringing prestige on the gang as a whole. [¶] … [H]aving a large amount of money is a big motivator for younger individuals coming up into the gang. That's one of the primary ways that young gang members establish themselves within the gang is by making money. [¶] So in the context of this, by dealing narcotics, being a known gang member, being a high level gang member, I would say that it absolutely does benefit the gang as a whole. [¶] Additionally, we talked about the younger gang members trying to make a

16

name for themselves. As an older gang member or a gang member with position of power, it's a very volatile situation. You have to be able to maintain that power. You can't -- okay, well, you know, I made it this far, and I'm good, and I don't have to do anything else because there's always somebody else trying to come up, prove their worth and try to replace you. [¶] So even somebody who is a high ranking individual is still likely to be out there committing crimes and promoting his gang, not necessarily the fighting crimes but certainly dealing with narcotics or crimes of that nature, the monetary based crimes."

Shelton continued: "The second aspect is the firearms aspect of it. And I alluded to it earlier, gang members feel strength when they're armed. It's not only the fact that they can protect themselves in the self-defense situation, but they are protecting their gang as a whole by patrolling the streets, by patrolling their neighborhoods. Particularly, during a time when there is an active gang war, to keep outside factors or outside gangs from coming into their neighborhoods and shooting up their residences like we've heard about during some of the earlier evidence. [¶] And then not only that, again, it shows that the deterrents, but it also shows that, hey, this gang is able to procure firearms, make money. It also serves as a deterrent to the civilian populous of the community at large because as a community member, if I know that this gang -- whatever that gang may be, in this case the East Side Pirus is active in my neighborhood, and they are actively committing crimes with guns, are actively doing shootings, are actively carrying guns, oftentimes, especially with the East Side Pirus, we respond to calls where individuals are just out there waving guns for no other purpose than to make sure everybody knows that they have them. [¶] And what that does is it serves to intimidate a community. So that when there is a crime, whether it be a burglary, whether it be a shooting, whatever the case may be, a victim based crime when law enforcement responds, the community is less likely to cooperate with law enforcement because they are afraid of retaliation from those gang members within their neighborhood. They are afraid of what might happen to

17

them.  They know they live in that community, and they don't want the same thing to happen to them."

The prosecutor also asked Shelton whether the hypothetical gang member intended to assist, further, or promote the East Side Pirus, and Shelton responded that he did.  Shelton explained:  "Based on the exact same thing.  The fact that he's a known or in this hypothetical, a validated East Side Piru, who is of significant clout, who has a significant amount of status.  Again, being in an active East Side Piru neighborhood, patrolling that East Side Piru neighborhood with a gun, with narcotics to sell, he's actively promoting his gang simply by being who that individual is, being a recognizable individual simply by being where he is, being in a known gang neighborhood, and the activities that he's doing, selling narcotics, carrying a firearm."

## Verdict and Sentencing

The jury found defendant guilty on all four counts and found the gang enhancement allegations true.

The trial court sentenced defendant to an aggregate term of seven years eight months, calculated as follows:  on count two, possession of heroin for sale (Health & Saf. Code, § 11351), the midterm of three years and a consecutive midterm of three years on the gang enhancement; on count one, felon in possession of a firearm (§ 29800, subd. (a)(1), a consecutive term of eight months (one-third the midterm) and a consecutive term of one year (one-third the midterm), on the gang enhancement; on count three, possession of heroin or methamphetamine while armed with a loaded firearm (Health & Saf. Code, § 11370.1, subd. (a)), a concurrent midterm of three years and the midterm of three years on the gang enhancement, both stayed pursuant to section 654; and on count four, possession of methamphetamine for sale (Health & Saf. Code, § 11378), a concurrent midterm of two years and a concurrent midterm of three years on the gang enhancement.

18

## DISCUSSION

### I.  Sufficiency of the Evidence as to the Gang Enhancements

#### A.  Defendant's Contentions

Defendant asserts that the evidence was insufficient to support the jury's findings on the gang enhancement allegations.  According to defendant, there was no evidence that his possession of the gun and narcotics was for benefit of or done in association with a criminal street gang, or that he committed the acts with the requisite specific intent.[9] While our high court has noted that is possible for, "[a] drug dealer [to] possess drugs in saleable quantities, along with a firearm for protection, regardless of any gang affiliation, and without an intent to aid anyone but himself" (*People v. Sanchez* (2016) 63 Cal.4th 665, 699 (*Sanchez*)), we conclude the evidence here was sufficient to establish defendant committed the charged offenses for the benefit of his gang.

#### B.  Section 186.22 Gang Enhancement and Standard of Review

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . ." in accordance with the gang enhancement provisions of section 186.22, subdivision (b). " 'Like a conviction unsupported by substantial evidence, a true finding on a gang enhancement without sufficient support in the evidence violates a defendant's federal and state constitutional rights and must be reversed.' " (*People v. Perez* (2017) 18 Cal.App.5th 598, 606 (*Perez*).)  "The evidence must establish both of the two prongs to

---

[9] Because we conclude the evidence was sufficient to establish defendant committed the charged offenses "for the benefit of" a criminal street gang, we need not address the second gang-relation theory of "in association with" a criminal street gang.

the gang enhancement under section 186.22, subdivision (b)(1).  'First, the prosecution is required to prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang." ' " (*Perez*, at pp. 606-607.) This is sometimes referred to as the gang-related prong.  (See *People v. Rios* (2013) 222 Cal.App.4th 542, 564 (*Rios*).)  " 'Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*Perez*, at pp. 606-607.)  This is sometimes referred to as the specific-intent prong.  (See *Rios*, at p. 564.)

"Not every crime committed by gang members is related to a gang."  (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)  "Although a lone actor is subject to a gang enhancement, merely belonging to a gang at the time of the commission of the charged conduct does not constitute substantial evidence to support an inference the sole actor specifically intended to promote, further, or assist any criminal conduct by gang members.  [Citation.]  Otherwise . . . , 'gang enhancement would be used merely to punish gang membership.' " (*Perez, supra*, 18 Cal.App.5th at p. 607.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*Albillar, supra*, 51 Cal.4th at pp. 59-60.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' "

20

the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*); *People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*); *People v. Spencer* (1969) 71 Cal.2d 933, 937 (*Spencer*).)

## C. Analysis

### 1. The Gang-related Prong

Detectives Shelton and Barawed came upon defendant and a female in front of a dark house at night in a known gang neighborhood controlled by the East Side Pirus. Both detectives recognized defendant as a validated member of the East Side Pirus. Defendant had a loaded Ruger nine-millimeter semiautomatic with a round in the chamber and a torn plastic baggie indicative of narcotic sales. A subsequent search of defendant revealed that he had three baggies, two containing methamphetamine and one containing heroin in the amounts specified *ante*.

At the time of his encounter with the detectives, defendant was wearing two wristbands commonly worn by East Side Pirus which commemorated the victims of a 2011 triple homicide. Defendant also had a number of East Side Piru tattoos including a "P" standing for Piru and a "W" standing for West La Loma.

After defendant's arrest, law enforcement went to defendant's house to conduct a search. As they approached the house, they saw two validated East Side Pirus members outside the house along with the same female who had been with defendant no more than 30 minutes earlier. At defendant's house, Shelton found a baseball cap of a type commonly worn by East Side Pirus bearing the red letters R and C, which members of East Side Piru wear as symbolizing Rancho Cordova. Items found in his possession during a search of his cell indicated he was an East Side Piru Defendant's own statements during his phone conversations at the jail supported the prosecution's contention that defendant was not just a member of the gang, but a high-ranking member. His Facebook page and photographs on his phone further documented his gang activities.

The text messages from the phone found at the location where defendant was arrested, which defendant apparently attempted to delete by performing a factory reset, indicate that defendant was involved and cooperating with other individuals in the sale of controlled substances. Defendant's drug-selling activities were known to others, and, where defendant was arrested, in the middle of East Side Piru territory, "[y]ou have to be an East Side Piru or at least be blessed by East Side Piru," to sell controlled substances.

Shelton testified that the East Side Pirus' objectives included making money and one of the ways they did so was by selling narcotics and some of these funds were used to financially support incarcerated members. Financial support included bailing gang members out of jail, putting money on incarcerated gang members' books or phones, and purchasing care packages for inmates.

The totality of the evidence, including both Shelton's expert testimony and additional evidence admitted at trial, established that defendant was a high ranking, "upper echelon" validated member of the East Side Pirus apprehended in the middle of East Side Piru territory engaged in one of the primary activities of the East Side Pirus—possession of controlled substances for sale—which he could not do unless he was a member or had the blessings of the East Side Pirus.

All of this evidence permits the inference that, on the night of his arrest, defendant possessed methamphetamine and heroin for sale in association with and for the benefit of the East Side Pirus.

Additionally, defendant, whose gang was embroiled in a "beef" with the Varrio Eastside Norteños, was armed with a loaded firearm at the time of his arrest. Shelton testified that "[g]ang members, especially during a time of an active gang war or a beef . . . , there are several expectations placed on that gang member," including protecting himself or herself, the gang, and the gang's neighborhood. Thus, this evidence, in addition to the obvious inference of needing a gun to protect his narcotics, support the gang enhancement allegation true findings as to the firearm offense.

22

In the face of this evidence we cannot say there is "no hypothesis" supporting the jury's gang relation finding.  (See *Penunuri, supra,* 5 Cal.5th at p. 142; *Zamudio, supra,* 43 Cal.4th at p. 357; *Bolin, supra,* 18 Cal.4th at p. 331; *Spencer, supra,* 71 Cal.2d at p. 937.)  To the contrary, the foregoing constitutes substantial evidence to satisfy the gang-related prong, specifically that defendant committed his crimes for the benefit of the East Side Pirus.

## 2.  The Specific Intent Prong

Regarding specific intent, we note, "[r]arely is the perpetrator's intent proven by direct evidence; usually it must be inferred from the facts and circumstances surrounding the case." (*Perez*, *supra*, 18 Cal.App.5th at p. 607.)

The evidence here established that the sale of controlled substances would promote, further, or assist the gang financially.  And all of the above evidence showing gang relation also supports an inference of defendant's specific intent as to both the controlled substances and firearm charges.  Additionally, Shelton opined that the hypothetical gang member the prosecutor asked him about intended to assist, further, or promote the East Side Pirus.  In doing so, Shelton did not merely offer his opinion on the matter.  He described facts, supported by evidence in the record, including defendant's own statements during the jail phone conversations, which would permit the jury to infer defendant's intent from the facts and circumstances in the case.  (*Perez, supra*, 18 Cal.App.5th at p. 607.)  Indeed, defendant's Facebook account and his phone conversations support the inference that his gang was his personal primary activity and a way of life for him.

Again, " ' " 'a reversal for insufficient evidence is unwarranted unless it appears that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " ' " the jury's finding that, in committing the charged crimes, defendant specifically intended to promote, further, or assist criminal conduct by gang members.  (See *Penunuri, supra,* 5 Cal.5th at p. 142, italics added; see also *Zamudio, supra,* 43 Cal.4th at p. 357; *Bolin,*

*supra,* 18 Cal.4th at p. 331; *Spencer, supra,* 71 Cal.2d at p. 937.) We conclude that substantial evidence supports the jury's finding that defendant committed the charged crimes with the requisite specific intent.

### 3. Cases upon which Defendant Relies

Relying on *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*), defendant advances the premise that "[a] gang expert's testimony alone is insufficient to find an offense gang related." *(Id.* at p. 657.) Defendant cites the *Ochoa* court's statements that " '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang' " and "something more than an expert witness's unsubstantiated opinion that a crime was committed for the benefit of, at the direction of, or in association with any criminal street gang is required to justify a true finding on a gang enhancement." (*Id.* at pp. 657, 660.)

Defendant acknowledges that several years after *Ochoa* our high court stated: " '[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).) However, defendant emphasizes that our high court in *Vang* further stated that the expert testimony in that case, "if found credible, might, *together with the rest of the evidence*, cause the jury to find the assault was gang related." (*Ibid*., italics added.) Thus, defendant asserts that our high court has not disapproved of *Ochoa* and similar cases, and has not held that expert testimony *alone* is sufficient to support a true finding on a gang enhancement allegation.

First, we reject defendant's broad reading of *Ochoa*. While the court in *Ochoa*, *supra*, 179 Cal.App.4th at pages 657, 659, citing *People v. Ferraez* (2003) 112 Cal.App.4th 925, 931 (*Ferraez*), spoke of expert *testimony* being insufficient without

24

evidentiary support, a close reading of *Ochoa* and *Ferraez* suggests that those courts were referring to the expert's bottom line *opinion* about the crime benefiting the gang not being sufficient in and of itself. The expert's other testimony can be part of the evidentiary support underlying the expert's bottom line opinion that the crime benefited the gang. For example, the expert's testimony about the gang's culture and habits is part of the evidentiary support underlying an inference that the conduct was committed for the benefit of the gang. (See *Vang, supra,* 52 Cal.4th at p. 1044 [gang experts may testify about the culture and habits of gangs]; *Ferraez*, at p. 930 [same].) So too is an expert's testimony that particular criminal conduct enhances the gang's reputation (*Albillar, supra*, 51 Cal.4th at p. 63), or that the commission of certain crimes elevates the status of the gang member and the gang, and thus such conduct benefits the gang (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 354; *People v. Romero* (2006) 140 Cal.App.4th 15, 19).

Second, as for expert *opinion* evidence, we agree that the opinion of the expert that a crime benefits a gang can be sufficient to support the section 186.22, subdivision (b)(1), gang enhancements *when that opinion is supported by evidence in the record*. Indeed, a gang expert's opinion to this effect must be supported by and based on the evidence presented at trial. Otherwise, it would not be relevant, probative, or assist the trier of fact in its fact-finding responsibilities. We conclude that, unlike the cases on which defendant relies, the jury's determination here was supported by the gang expert's opinion together with abundant evidence presented at trial.

*Ochoa* is distinguishable. In concluding that substantial evidence did not support the gang enhancement allegation true findings in *Ochoa*, a robbery/carjacking prosecution where the defendant was the sole perpetrator, that court stated that "nothing in the circumstances of the instant offenses sustain the expert witness's inference that they were gang related." (*Ochoa, supra*, 179 Cal.App.4th at pp. 661-662.) The court noted: "[d]efendant did not call out a gang name, display gang signs, wear gang clothing,

25

or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of defendant's tattoos. *There was no evidence the crimes were committed in Moreno Valley 13 gang territory* or the territory of any of its rivals. There was no evidence that the victim of the crimes was a gang member or a Moreno Valley 13 rival. Defendant did not tell anyone, as the defendant did in *Ferraez*, that he had special gang permission to commit the carjacking. [Citation.] Defendant was not accompanied by a fellow gang member." (*Ochoa*, at p. 662, fn. omitted, italics added.) Also problematic in *Ochoa*, "the prosecutor did not pose any hypothetical to the gang expert, but essentially asked him the impermissible question of whether the particular crimes were committed to benefit defendant's gang. Thus, the prosecutor's questions posed precisely the danger warned of in" *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), disapproved on a different ground in *Sanchez, supra,* 63 Cal.4th at p. 686, footnote 13, specifically " ' "the risk that the jury might improperly consider [expert opinion testimony] as independent proof of the facts recited therein." ' " (*Ochoa*, at p. 664, citing *Gardeley*, at pp. 618-619.)

Here, the prosecutor asked Shelton hypothetical questions based on facts similar to the facts of this case, and avoided the problem discussed in *Ochoa* created by asking the gang expert directly whether the defendant committed the crimes to benefit his or her gang. Also, unlike in *Ochoa*, defendant's crimes were committed in gang territory, a circumstance the *Ochoa* court highlighted as missing in that case. (*Ochoa*, *supra*, 179 Cal.App.4th at p. 662.) Defendant was wearing wristbands commonly worn by East Side Pirus which Shelton observed as he was moving defendant to a vehicle. The evidence, including text messages from defendant's cell phone and the amount of the controlled substance on his person, clearly established he was in the narcotics trafficking business. During one of his jail phone conversations, defendant complained his "whole empire is crumbling." To which the unidentified female with whom he was speaking noted that

26

defendant had relied on "some faulty bitches" who "wouldn't have fallen because *you wouldn't have been there with all that shit on you*."

Additionally, unlike the expert in *Ochoa*, Shelton did not testify that crimes such as those committed here committed by a gang member "would always be for the benefit of the gang . . . ." (*Ochoa, supra*, 179 Cal.App.4th at p. 662.) Presented by the defense with a hypothetical scenario of an East Side Piru going to Orangevale and selling narcotics, Shelton testified that whether the crime would benefit the gang or further the gang would depend on the totality of the circumstances. He testified, "Could it further the gang? Maybe. Maybe not. Compared to doing it within the gang territory? Absolutely . . . ." Shelton noted that anybody could go into Orangevale where no particular gang set runs the neighborhood, "[b]ut within [the] gang set neighborhood, the only person allowed to do that is somebody from that gang. You cannot sell dope or sell narcotics there, or commit other crimes there without being a . . . member of that gang, or hav[ing] permission of that gang . . . if you do, you are going to end up hurt." Asked on cross-examination about a hypothetical circumstance of an East Side Piru going to another neighborhood and committing robbery, Shelton testified that, based on those facts, "that simple act doesn't necessarily make it benefit the gang. [¶] So in that very specific or broad description that you provided, I couldn't say one way or the other. Maybe it is, maybe it isn't." Subsequently asked on cross-examination if he could "see that a gang member can certainly commit a crime that's not for the benefit of the gang," Shelton responded, "Oh, absolutely, yes." A gang member could rob someone without the gang benefiting. Thus, Shelton did not opine that crimes committed by a gang member would always be for the benefit of the gang, but only that *these* crimes committed under *these* circumstances were for the benefit of the gang. Unlike in *Ochoa*, we do not see Shelton's testimony as improperly informing the jury how the expert believed the case should be decided, without any underlying factual basis to support it. (*Ochoa,* at p. 662.)

27

Defendant also relies on *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), in which a police officer stopped a minor who was on a bicycle when he failed to stop at a red light and discovered that the minor had on his person a concealed knife, a small bindle of methamphetamine, and a red bandana. (*Id*. at p. 1195.) The minor was charged, among other things, with carrying a concealed dirk or dagger (former § 12020, subd. (a)(4)), with a gang enhancement allegation (§ 186.22, subd. (b)(1)). (*Frank S.*, at p. 1195.) In concluding that substantial evidence did not support the gang enhancement allegation true finding, the *Frank S.* court stated: "the expert simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved to the trier of fact. She stated the knife benefits the Nortenos since 'it helps provide them protection should they be assaulted by rival gang members.' However, unlike in other cases, the prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish that possession of the weapon was 'committed for the benefit of, at the direction of, or in association with any criminal street gang . . . .' [Citation.] *The prosecution did not present any evidence that the minor was in gang territory,* had gang members with him, *or had any reason to expect to use the knife in a gang-related offense*. In fact, the only other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection. To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*Id*. at p. 1199, italics added.)

Here, unlike the circumstances in *Frank S.*, the evidence established that defendant was in gang territory and was engaged in a primary activity of the gang of which he was a high-ranking member. Moreover, the evidence established that defendant had a concrete reason to be in possession of a loaded firearm in addition to protecting his product—the

28

ongoing beef with the Varrio Eastside Norteños.  Indeed, this conflict had been active for years, and, according to Shelton, was "heaviest" around the time of defendant's arrest.

*People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), another case on which defendant relies, is of no help to defendant.  There, the defendant was convicted of receiving a stolen vehicle and firearm possession offenses, and the jury found true gang enhancement allegations (§ 186.22, subd. (b)(1)).  (*Ramon*, at p. 846.)  The prosecution's gang expert relied on two facts in concluding that the defendant committed his crimes for the benefit of a criminal street gang with the specific intent to promote that gang:  "(1) Both the defendant and the codefendant were members of the Colonia Bakers criminal street gang, and (2) the two were stopped in territory claimed by the Colonia Bakers.  From these two facts, along with the crimes the two were accused of committing, [the gang expert] opined that the crime was committed for the benefit of the Colonia Bakers criminal street gang and was intended to promote the Colonia Bakers."  (*Id*. at p. 849.)  The gang expert's opinion was based on his belief that, because a gun and a stolen vehicle could be used to commit crimes, the two defendants must have been acting on behalf of their gang.  (*Ibid*.)  In determining that the evidence was insufficient to support the true findings, the *Ramon* court concluded that there were no facts in the record from which the expert could discern whether the codefendants were acting on their own behalf or on behalf of their gang, and, because the factors on which the expert based his opinion were insufficient to permit him to arrive at a conclusion on the defendant's specific intent, that opinion could not constitute substantial evidence to support the true findings.  (*Id*. at pp. 851-852.)  Among other things, the *Ramon* court noted:  "The analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang.  That did not occur and we will not speculate."  (*Id*. at p. 853.)

Defendant also relies on *Rios, supra*, 222 Cal.App.4th 542, another case involving vehicle theft and firearms possession charges.  There, the defendant, who was the sole occupant, was driving the stolen vehicle.  A gun and gang-related clothing were found

29

inside.  (*Rios*, at pp. 547-548.)  Regarding the gang enhancement, the *Rios* court focused only on the specific intent prong, specifically "whether there was substantial evidence that defendant stole the car and carried the loaded firearm in the car [citation] 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Id.* at p. 572.)  The *Rios* court noted that in answering hypothetical questions relevant to the firearms count, the gang expert was asked to consider only two facts:  (1) the person was a gang member and (2) he possessed a gun.  (*Id.* at p. 573.)  Similarly, as to the vehicle theft crime, the hypothetical question asked the expert to consider only two facts:  (1) possession of a stolen vehicle (2) by a gang member.  (*Id.* at p. 574.)  The *Rios* court concluded that such expert testimony was insufficient to support an inference that the defendant committed each crime with the specific intent to promote, further, or assist in any criminal conduct by gang members.  (*Id.* at pp. 573-574.)  That court further reasoned:  "[L]ike *Frank S.* and *Ochoa*, there was *no evidence that defendant was in Norteño territory or rival gang territory when he stole the car*; that he called out a gang name, displayed gang signs or otherwise stated his gang affiliation; or that the victims of the car theft were rival gang members or saw his tattoos or gang clothing.  Here, although there was evidence that auto thefts and illegal gun possession were among the primary activities of the Norteño gang in Salinas, that evidence alone was insufficient to support the inference that defendant stole the Chrysler and possessed the gun with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Rios*, at p. 574, italics added.)

Here, defendant, a high-ranking East Side Piru member, was apprehended in gang territory wearing gang paraphernalia.  Lurking in a dark area, he was engaged in possession of controlled substances for sale—which, unlike in *Ramon*, was indeed established as a primary activity of the East Side Pirus.  Firearms offenses were also an established primary activity.  Additionally, unlike robbery, vehicle theft, and weapons possession, the sale of narcotics here is a crime closely tied to gang territory; it is done by

30

East Side Piru gang members in their territory where nobody else is permitted to do so. That activity was also connected with the gang's efforts to support both the gang and incarcerated gang members financially. Again, as for the firearm charge, it can be inferred that the firearm facilitated the crime of selling or possessing for sale controlled substances by providing a security mechanism to protect the product. Moreover, defendant was armed with a loaded firearm at a time characterized as the "heaviest" period of the gang conflict between the East Side Pirus and the Varrio Eastside Norteños. And as we have noted, defendant's Facebook account and his own statements made during jail phone calls supports the inference that defendant's gang was a way of life for him.

Unlike in the cases upon which defendant relies, Shelton here did not "simply inform[] the jury of how he felt the case should be resolved." (*Ramon, supra*, 175 Cal.App.4th at p. 851.) Instead, he offered his opinion based on a hypothetical reflecting the facts of this case, provided relevant background information concerning the East Side Pirus, and his opinion was supported by other evidence in the record.

### 4. Conclusion

We conclude that substantial evidence supported both the gang-related prong and the specific-intent prong of the section 186.22, subdivision (b), gang enhancement allegations. Accordingly, we reject defendant's contention that the jury's true findings as to the gang enhancement allegations were not supported by substantial evidence.[10]

---

[10] In part II. of the Discussion, *post*, we determine that certain items of evidence were improperly admitted under *Sanchez, supra*, 63 Cal.4th 665. We have not considered this evidence in our legal sufficiency/substantial evidence analysis.

31

## II.  Confrontation Clause Claims

### A.  Defendant's Contentions

Defendant asserts that his Sixth Amendment confrontation clause rights were violated when the trial court allowed Shelton to testify to facts where the bases for Shelton's knowledge constituted testimonial hearsay.  Defendant points out that Shelton testified, based on information he had been told or read about in police reports, about other declarants' statements such as who had been validated, predicate offenses, and defendant's conduct while in custody.  Defendant asserts that, under *Sanchez, supra*, 63 Cal.4th 665, all of this testimony constituted case-specific testimonial hearsay, the admission of which violated his confrontation clause rights.  We conclude that two topics of Shelton's testimony were inadmissible, but conclude the admission of that evidence was harmless.

### B.  Hearsay, *Crawford*, and *Sanchez*

" Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  "Except as provided by law, hearsay evidence is inadmissible."  (Evid. Code, § 1200, subd. (b).)

"In [*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*)], the United States Supreme court held that the admission of testimonial hearsay violates the confrontation clause unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant.  [Citation.]  However, the court further stated that the confrontation clause does [not] prohibit the admission of testimonial statements for purposes other than establishing the truth of the matter asserted."  (*Crawford*, at pp. 53-54, 59, fn. 9.)

In *Sanchez,* our high court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion," and held that "case-specific statements related by the prosecution

32

expert concerning [a] defendant's gang membership constitute[] inadmissible hearsay under California law." (*Sanchez*, *supra*, 63 Cal.4th at p. 670.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.)

The *Sanchez* court further held that some of the hearsay statements in that case were also testimonial and should have been excluded under *Crawford*. (*Sanchez*, *supra*, 63 Cal.4th at pp. 670-671.) Our high court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686.) In adopting these rules, the *Sanchez* court disapproved of its pre-*Crawford* decisions which held that the matters upon which an expert relied as the bases of the expert's opinion were not offered for their truth, and rejected the notion that a limiting instruction coupled with an Evidence Code section 352 balancing analysis was sufficient to allay hearsay and confrontation clause concerns. (*Id.* at p. 686, fn. 13.)

However, *Sanchez* did "not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his [or her] expertise." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) As the *Sanchez* court observed, "an expert's background knowledge and experience is what distinguishes him [or her] from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth." (*Ibid.*) A gang expert may relate such background information regarding his or her knowledge and expertise, as well as premises generally accepted within his or her field, even though such testimony is

offered for its truth.  (*Ibid*.)  Thus, a gang expert may testify concerning general background information relating to gang culture and the "*history* and *general operations*" of a specific gang.  (*Id*. at p. 698, italics added.)  Applying this rule to the facts in *Sanchez*, our high court noted that the gang expert's testimony about "general gang behavior or descriptions of the . . . gang's *conduct* and its *territory*" was "background testimony."  (*Ibid*., italics added)  Such testimony is based on well-recognized sources in the expert's area of expertise.  (*Ibid*.)

If gang expert testimony contains case-specific hearsay, we must then consider whether the testimony constituted *testimonial* hearsay.  (*Sanchez, supra*, 63 Cal.4th at p. 680.)  The United States Supreme Court has not provided a clear definition of "testimonial."  (*People v. Leon* (2015) 61 Cal.4th 569, 603 (*Leon*).)  However, our high court has "discerned two requirements.  First, 'the out-of-court statement must have been made with some degree of formality or solemnity.'  [Citation.]  Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' " (*Ibid*.; accord, *People v. Dungo* (2012) 55 Cal.4th 608, 619 [referring to the formality and primary purpose criteria as "critical components" instead of "requirements"].)  "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . , or for some primary purpose other than preserving facts for use at trial."  (*Sanchez,* at pp. 694-695.)  Formal police reports may be made with the requisite degree of formality or solemnity.[11]  (*Ibid*.)

---

[11]  The prosecution was on notice concerning the potential confrontation clause issues here.  In denying defendant's hearsay and confrontation clause objections, the trial court expressly noted that the law concerning whether an expert can rely on hearsay and testimonial hearsay was "in flux" and that *Sanchez* was then pending in the California Supreme Court.

## C. Analysis

### 1. Predicate Offenses

The definition of criminal street gang requires that the organization engage in a pattern of criminal gang activity. (§ 186.22, subdivision (f).) A gang engages in a " 'pattern of criminal gang activity' " so as to satisfy that element of the statute "when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' " (*People v. Zermeno* (1999) 21 Cal.4th 927, 930, quoting § 186.22, subd. (e).)

Shelton testified about two predicate offenses, one involving individuals not involved in the current case and one involving defendant. He testified that, in preparing for this testimony, he reviewed several police reports.

Shelton testified that in September 2013, Rancho Cordova police officers conducted a vehicle stop in a gang neighborhood. The driver was a known East Side Piru associate, Mario Sangado, and the passenger was a validated East Side Piru member, Tremaine Robinson, who was on probation. The officers conducted a probation search of Robinson and found approximately four grams of methamphetamine and four and a half ounces of heroin. Officers arrested Robinson for possession of heroin and methamphetamine for sale. Robinson pled no contest to possession for sale under Health and Safety Code section 11351 and was sentenced to two years in jail.

Where a predicate offense involves neither the particular events nor participants involved in the case being tried, the testimony concerning those offenses is admissible as background information. (*People v. Bermudez* (2020) 45 Cal.App.5th 358, 376-377 (*Bermudez*).) "Predicate offenses are chapters in a gang's biography and constitute historical background information, not case-specific information." (*Id.* at p. 363.) A gang expert may testify to non-case-specific general background information about the gang, including "its rivalry with [another gang], its *primary activities*, and *its pattern of*

35

*criminal activity*, even if it was based on hearsay sources." (*Id.* at p. 377, some italics added.) Consequently, we conclude Shelton's testimony concerning the Robinson predicate offense did not violate *Sanchez*.[12]

As noted, the other predicate offense involves defendant. Shelton testified that in March 2011, Rancho Cordova police responded to a call reporting shots fired in an apartment complex. The apartment complex, which was in a known East Side Piru neighborhood, was known for gang activity. When officers arrived, they heard shots being fired. They searched the area and encountered defendant. Defendant fled and the officers chased and eventually apprehended him. Defendant resisted the officers and a violent struggle ensued. During the struggle, defendant threw a handgun over a fence. Officers subdued defendant, handcuffed him, and found the handgun. Defendant pled no contest to illegal possession of a firearm in violation of former section 12021, and was sentenced to 365 days in jail.

There is no indication in the record that Shelton was personally involved in that case and, based on his acknowledgment that he read the police report about the incident, as well as his description of it, it does not appear that he was. Because this testimony consisted of out-of-court statements from a police report, offered for the truth of the matter asserted, and involved a participant in the case being tried, it was case-specific hearsay. (Evid. Code, § 1200; *Sanchez, supra*, 63 Cal.4th at p. 676.) There was no showing that any exception to the hearsay rule applied. Further, there was no showing of unavailability or that defendant had a prior opportunity for cross-examination or forfeited

---

[12] We also note that a certified copy of the record of the Robinson conviction was introduced into evidence, and would have been admissible over a hearsay objection had there been one. (Evid. Code, § 452.5; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 589, fn. 10; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461.) This record of conviction was evidence of the predicate offense independent of Shelton's testimony concerning the underlying facts.

that right by wrongdoing.  (See *Sanchez*, at pp. 680, 686.)  Therefore, we proceed to the second step of the two-step inquiry described in *Sanchez* and consider whether the content of Shelton's testimony constituted *testimonial* hearsay.  (*Id*. at p. 680.)

Shelton's testimony concerning the predicate offense involving defendant was based on a police report concerning the shots fired incident and investigation, and the report pertained to defendant's criminal prosecution.  (*Leon, supra*, 61 Cal.4th at p. 603.)  As defendant correctly asserts, because he objected to Shelton's proposed testimony on confrontation clause grounds, the prosecution, "as the proponent of evidence presumptively barred by the hearsay rule and the Confrontation Clause," bore the burden of establishing it was not testimonial hearsay.  (*Idaho v. Wright* (1990) 497 U.S. 805, 816 [111 L.Ed.2d 638, 652-653] (*Wright*); see *United States v. Jackson* (5th Cir. 2011) 636 F.3d 687, 695 [the government bears the burden of defeating the defendant's properly raised confrontation clause objection by establishing that its evidence is nontestimonial]; *People v. Livaditis* (1992) 2 Cal.4th 759, 778; *Ochoa, supra*, 7 Cal.App.5th at pp. 584-585.)  The prosecution did not address this issue and as a consequence, did not meet its burden.

On this record, the evidence pertaining to the underlying facts of the predicate offense involving defendant constituted testimonial hearsay.  Therefore, we conclude that it was error for the trial court to admit this testimony and defendant's confrontation clause rights were violated as a result.  Whether this error was harmless will be discussed in part II.D. of the Discussion*, post*.

### 2.  Gang Validation Documents Related to Other Gang Members

Defendant contends Shelton's testimony concerning the "contents of police 'gang validation' documents, the 'official documentation of somebody's gang involvement' " violated his confrontation clause rights.  Defendant focuses his argument on the numerous individuals who Shelton identified as validated East Side Piru gang members

37

during his testimony.[13]  Defendant asserts that Shelton's testimony concerning " 'gang validation' documents" related to others with whom he appeared in photographs, individuals with or about whom he communicated while in jail pending trial, individuals whom he interacted with on a Facebook account, and individuals who were at defendant's house on the day he was arrested, all constituted inadmissible hearsay testimony.

We disagree because as we have noted, "a gang expert may 'testify to non-case-specific general background information about [the gang], its rivalry with [another gang], its *primary activities*, and its *pattern of criminal activity*, even if it was based on hearsay sources.' " (*Bermudez*, *supra*, 45 Cal.App.5th at p. 377, some italics added.)  We see the gang validation material relating to the gang membership of individuals not involved in this case as background information admissible under *Sanchez*.  Just as the predicate offenses are chapters in the gang's biography, its members are also part of that biography.[14]

---

[13] Defendant acknowledges that he knew Detectives Barawed and Shelton from prior contacts and that he had personally told Barawed he was an East Side Piru member when Barawed last validated defendant.  Defendant further acknowledges that Shelton's testimony in this regard was admissible as a party admission.  (See Evid. Code, § 1220.)

[14] This testimony is different from the testimony found to be inadmissible in *Sanchez* related to a "STEP Notice" and field identification cards documenting occasions when the defendant was found to be in the presence of other gang members.  The hearsay and confrontation issue raised by that testimony related to the gang expert testifying about the defendant's past contacts with law enforcement, including contacts with other gang members, when the officers who actually had contact with the defendant did not testify.  (See *Sanchez*, *supra*, 63 Cal.4th at pp. 673, 674, 696-698.)  Since that information pertained to defendant, it was case-specific.  Nothing in *Sanchez* suggests identifying other individuals – who are not involved in the current case -- as documented or validated gang members violates the confrontation clause.

### 3. E-mails Sent to Defendant While in Custody

Defendant challenges the admission of testimony relating to the contents of several e-mails from March 27 and 28, 2015, that were sent to him while he was in jail awaiting trial. Shelton explained how jail inmates are able to receive e-mails from people outside of the jail. He testified that he reviewed the e-mails in question and noted that they contained numerous East Side Piru terms. Additionally, there were numerous e-mails sent by known validated East Side Piru members from e-mail addresses that had East Side Piru references in them.

This testimony did not constitute case-specific testimonial hearsay barred by *Sanchez*. In *Sanchez*, our high court included a number of examples to illustrate the difference between case-specific facts and background information. Among the examples, our high court stated: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph.[15] *That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang*." (*Sanchez, supra*, 63 Cal.4th at p. 677, italics added.) Here, Shelton did not testify about the truth of the matters asserted in the e-mails. Indeed, because the e-mails were not offered for the truth

---

**15** As we discussed in *Bermudez*, this hypothetical must be understood as relating to a hypothetical associate who was a participant in the events involved in the case being tried, not a fellow gang member uninvolved in the case, but who had committed a predicate offense. (*Bermudez, supra*, 45 Cal.App.5th at p. 377.) We arrived at this conclusion because: "(1) the issue before the *Sanchez* court did not relate to facts underlying predicate offenses, but rather related to facts establishing the defendant's gang membership, which included gang expert testimony concerning the gang affiliations of people defendant had been with on previous occasions, and (2) the *Sanchez* court's explanation of background facts includes facts related to the conduct, history and operations of the gang." (*Ibid.*, fn. 13.)

of the matters asserted therein, the e-mails did not constitute hearsay. Shelton testified that the content of the e-mails, which had been sent to defendant, included East Side Piru references. We see this as being analogous to testifying as to the *significance* of the diamond tattoo. This testimony was not barred as case-specific hearsay under *Sanchez*. Nor could this information, none of which was written by law enforcement, be considered testimonial. This testimony was properly received.

### 4. E-mail in Defendant's Possession Addressed to Another Gang Member

Defendant asserts that testimony concerning a printed e-mail discovered in his property box in his jail cell was testimonial hearsay. As Shelton testified, this e-mail was sent to Jermaine Edwards, a validated East Side Piru gang member with whom defendant was associated. The email address of the sender and the sender's name indicated the sender was an East Side Piru. Shelton testified concerning the contents of the e-mail, including his interpretations, in pertinent part as follows: "Hell of shit has been going on, feel me, so the sender is telling the recipient that there's a lot of stuff going out on the streets. There is a lot of activity within the gang bang going on in the streets. But our first priority is bailing you out. [¶] What he is saying is our, it's not the sender's first priority, it's the gang as a whole, their gang's first priority is getting Jermaine Edwards out of jail by bailing him out. [¶] I've been on Bloods helmet. On blood, basically an East Side Piru reference. Pirus are a subset of the Bloods. I'm going to put money on the phone, so call when you get this, Ru. Again, the sender is supporting Jermaine Edwards monetarily by putting money on his phone, so that he can make calls. And then finishing it with, Ru. Referring to Edwards as Ru, a term of endearment for Pirus. Be smooth, West, means stay out of trouble, and then West La Loma."

The testimony pertaining to the contents of this e-mail does not contain case-specific facts. The email pertained to another gang member, putting money on that gang member's phone account and the priority of the gang to bail him out. Nothing in this e-mail or Shelton's interpretation of it pertains to "the particular events and participants

40

alleged to have been involved in the case being tried." Thus, Shelton's testimony did not contain prohibited case-specific hearsay under *Sanchez.* Nor could this testimony, involving a document not written by law enforcement, be considered testimonial.

### 5. Facebook Comments

Defendant challenges the admission of several comments to photos found on his own Facebook page left by other people. These included remarks left on Facebook posts such as "Wild Wild West," which according to Shelton, refers to West La Loma; "I see you, west, 2100," West and 2100 referring to West La Loma; "2100"; "PJ West La Loma," PJ being defendant's street name; "that's two 747 big bombers," meaning "it's two influential individuals. A big deal is what it's saying. It's not t[w]o little guys within the gang. They are 747 bombers. They are a big thing"; and "What up, Ru," "Ru" being a greeting short for Piru. Defendant does not offer specific arguments relevant to this material, and we will not supply them. We do not view these comments as case-specific hearsay and they certainly are not testimonial. These items were not inadmissible under *Sanchez.*

### 6. Defendant's Contacts with Law Enforcement in the Presence of East Side Piru Gang Members

Defendant complains about Shelton's testimony concerning the fact that he had been contacted by law enforcement no fewer than 21 times in recent years in the presence of other gang members. Because this testimony involved defendant, an individual involved in the case being tried, it was case-specific. (*Sanchez, supra*, 63 Cal.4th at p. 676.) Indeed, the *Sanchez* court expressly found similar evidence in that case to be case-specific hearsay and testimonial. (*Id*. at pp. 673, 674, 696-698.) Shelton did not testify that he personally contacted defendant in the company of other validated gang members 21 or more times, and thus, the testimony was hearsay. Further, it cannot be said on this record that this testimony did not constitute testimonial hearsay. The prosecution did not satisfy its burden of proving that the hearsay was nontestimonial.

41

(see *Wright, supra*, 497 U.S. at p. 816.) We shall discuss prejudice in part II.D. of the Discussion*, post*.

### 7. Information from Jail Incident Reports

Defendant contends Shelton's testimony about the "contents of a June 2015 report, and a July 2015 report made by officers at" RCCC was testimonial hearsay. Shelton discussed an "informational report" completed by RCCC officers which stated that defendant and another individual, both of whom were validated East Side Pirus, "were stealing from other inmates and ordering them or having them assaulted." In another instance, defendant and several other inmates were involved in a jail fight in which defendant and several other individuals, many of whom were validated East Side Pirus, "assaulted another individual."

This testimony involved case-specific facts, as defendant was involved in each incident and the purpose of the testimony was to demonstrate his involvement and, by extension, the fact that he was an active East Side Piru member. It appears that Shelton had no personal knowledge of or involvement with these incidents, so his testimony was hearsay. It further appears that Shelton's testimony concerning these reports constituted *testimonial* hearsay and the prosecution did not satisfy its burden of proving that the evidence was nontestimonial. (See *Wright, supra*, 497 U.S. at p. 816.) The trial court erred in admitting this testimony. Prejudice will be considered *post*.

### D. Prejudice

### 1. Harmless Error Standard

Defendant asserts that he was prejudiced by the court's errors in admitting the testimony discussed *ante*, and that the People cannot establish that the error was harmless beyond a reasonable doubt under the standard of *Chapman v. California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*). "Confrontation clause violations are subject to federal harmless-error analysis under" *Chapman*. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*); *People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); see

*Sanchez, supra*, 63 Cal.4th at pp. 670-671, 698 [assessing prejudice resulting from admission of testimonial hearsay under *Chapman*].)

Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Geier, supra*, 41 Cal.4th at p. 608.) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; accord *Livingston, supra*, 53 Cal.4th at p. 1159.)

## 2. Predicate Offense Involving Defendant

We have concluded that Shelton's testimony supporting the predicate offense involving defendant was erroneously admitted. The record does not include a certified record of this conviction. Consequently, there was no admissible evidence supporting this predicate offense.

However, it is well-settled that the charged offense can serve as one of the two statutorily required predicate offenses. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1383; *Gardeley, supra*, 14 Cal.4th at p. 625; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1400.) The charged offenses, to which Shelton was a percipient witness and for which defendant was convicted, and the predicate offense involving Robinson, are sufficient to serve as the required predicate offenses and support the true findings on the gang enhancement allegations.

Thus, had the jury not been informed of the testimonial hearsay underlying the predicate offense involving defendant, the jury still would have concluded that the prosecution proved the "pattern of criminal gang activity" element of the gang enhancement allegation based on the predicate offense involving Robinson and the

43

charged offenses.[16]  The error was thus harmless beyond a reasonable doubt.  (*Chapman,*
*supra*, 386 U.S. at p. 24.)

### 3.  Defendant's Contacts with Law Enforcement in the Presence of East Side Piru Gang Members and Information from Jail Incident Reports

We have little difficulty in determining that the erroneous admission of Shelton's
testimony concerning law enforcement contacts with defendant in the presence of other
gang members and his testimony about the jail incident was harmless beyond a
reasonable doubt for purposes of establishing the gang enhancement.  We need not
marshal the relevant admissible evidence again.  Instead, we point to part I.C of our
Discussion, *ante*, in which we concluded the evidence discussed therein constituted
substantial evidence to support the gang enhancement allegation true findings. Given that
compelling evidence, we further conclude it " 'is clear beyond a reasonable doubt that a
rational jury would have reached the same verdict absent the error[s].' " (*Livingston,*
*supra*, 53 Cal.4th at p. 1159, quoting *People v. Loy* (2011) 52 Cal.4th 46, 69-70; accord
*Geier, supra*, 41 Cal.4th at p. 608.)

### III.  Admission of Assertedly Inflammatory, Excessive, and Marginally Relevant Gang Evidence

### A.  Defendant's Contentions

Defendant asserts that the admission of excessive, highly inflammatory,
prejudicial, and only marginally relevant gang evidence violated his right to due process
and a fair trial.  Defendant acknowledges that the prosecution had to offer evidence to
prove the gang enhancement allegations, but he asserts that the evidence presented by the
prosecution was "overkill."  Defendant contends the relevance of much of the evidence
was substantially outweighed by its prejudicial effect, its cumulative nature, and its

---

[16] Whether the introduction of the evidence concerning the predicate offense committed
by defendant prejudiced him on Evidence Code section 352 grounds will be discussed in
part III. of the Discussion, *post*.

inflammatory character. And he argues that the prejudicial nature of this evidence was not cured by jury instructions.[17]

## B. Forfeiture

The People assert that defendant forfeited this issue by failing to object to the evidence during trial. The People argue that defendant's standing objection was limited to Shelton's testimony "that what [defendant] 'was doing this particular day was for the benefit of this gang.' " In his reply brief, defendant asserts that his written motion was sufficient to bring his Evidence Code section 352 contention to the trial court's attention.

In his in limine motion to preclude aspects of Shelton's testimony, defendant did raise Evidence Code section 352 in the section objecting to the introduction of facts and findings unless testified to by its source. Defendant asserted that there would be no probative value to allowing Shelton to testify concerning the hearsay bases for his opinion as to defendant's gang status, "and the prejudice of trying a case in which the jury hears an onslaught of statements cherry-picked and characterized by Detective Shelton is manifest."

We shall assume, without deciding, that defendant's written motion was sufficient to preserve his objection to Shelton's testimony on Evidence Code section 352 grounds. (See generally *People v. Morris* (1991) 53 Cal.3d 152, 187-190, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [a motion in limine can be sufficient to preserve an issue where the requirements of Evidence Code section 353 are satisfied].) However, defendant did not raise Evidence Code section 1101 or make any arguments clearly implicating a character evidence objection or that section. Because defendant objected only on the ground that the proposed evidence was not probative and

---

[17] Because, in reference to much of the challenged evidence, we proceed directly to prejudice, we need not address defendant's contention that the instructions did not cure the alleged errors.

was unduly prejudicial under Evidence Code section 352, he has forfeited any claim he makes here that the trial court admitted this evidence in violation of Evidence Code section 1101, subdivision (a).  (*People v. Doolin* (2009) 45 Cal.4th 390, 437 (*Doolin*).)

### C.  Pertinent Evidence Code Sections, the Standard of Review and the Standard for Harmless Error

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  We review a trial court's evidentiary rulings under Evidence Code sections 352 for abuse of discretion.  (*Doolin, supra*, 45 Cal.4th at p. 437.)

Although defendant asserts that the applicable standard of review is the *Chapman* "harmless beyond a reasonable doubt" standard, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review such allegations of error under the 'reasonable probability' standard of" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227; accord *People v. Trujeque* (2015) 61 Cal.4th 227, 280.)  Under *Watson*, " 'defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' "  (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*).)  "Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and

46

the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id.* at p. 956.)

## D.  Analysis

### 1.  The Challenged Testimony

The specific evidence defendant raises in this argument is Shelton's testimony regarding:  the 2011 predicate offense involving defendant; defendant was found in the company of other validated gang members "[n]o less than 21 times between 2010 and his contact when he was arrested for this case"; the contents of the RCCC reports, as testified to by Shelton, stating that, while he was incarcerated awaiting trial, defendant had stolen from other inmates and had ordered the assault of other inmates; and evidence that defendant was involved with several other inmates, a number of whom were validated East Side Piru gang members, in an assault of another inmate.  Defendant also raises the jail phone conversation in which he indicated that he was about to take a fellow gang member "off the set," and in reference to whom he remarked, "Air It Out Republic," "put that on mir, bitch.  Put that on little republic," and "I'm putting that on mir," which Shelton testified meant to do a shooting.  According to defendant, all of this evidence "should have been excluded because these instances of [defendant's] alleged violent conduct were irrelevant and inflammatory and were likely misused by the jury to convict [defendant] on the gang enhancements."

As we discussed in part II. of the Discussion, *ante*, most of this evidence was improperly admitted due to its testimonial hearsay character.  Because we have concluded that the evidence should have been precluded on these grounds, we need not make a separate determination as to whether that evidence was *also* improperly admitted because the trial court assertedly abused its discretion under Evidence Code section 352. We can instead turn directly to the question of prejudice.

47

**2. Reference to Defendant being in the Presence of Gang Members 21 Times**

Given the admissible evidence establishing defendant's standing in the gang and his gang activities, including his own statements in the jail phone conversations and his Facebook account, an inference could be drawn without Shelton's reference to the 21 times law enforcement had found defendant in the presence of East Side Piru gang members that defendant had indeed been in the presence of his fellow gang members on multiple occasions. Thus, defendant has not established a reasonable probability that the admission of this evidence affected the result.

**3. Jail Phone Conversation Regarding a Gang Member not in Good Standing**

Defendant's jail phone conversation in which he discussed the standing of another gang member and what defendant intended to do about him was a party admission (Evid. Code, § 1220), admissible subject to defendant's Evidence Code section 352 objection. The prosecution's theory of the case, and specifically in reference to the gang enhancement allegations, was that defendant was an "upper echelon" member of the East Side Pirus, and that, as Shelton put it, "[i]f you have a gang member who is well known within the gang, well known by members outside of a gang, well known within the community, everything he does is going to have greater weight to how the gang is perceived . . . ." The prosecutor in her initial closing argument repeatedly emphasized defendant's high rank in the gang, that everything he did was for his gang, and that he was enhancing his stature by selling drugs and making money for "his empire." The prosecutor's reference to defendant's "empire" repeated the word defendant used in one of the jail phone conversations to describe his gang related drug operation.

We conclude the evidence concerning this jail phone conversation was relevant to the prosecution's theory of the case. It demonstrated that defendant was, in fact, a high-ranking member of the gang, such that he had authority to decide who was in good standing with the gang and what to do about someone who was not. Because this evidence helped prove defendant's status in the gang, which tended to prove the gang

48

enhancement allegations, this evidence was relevant (Evid. Code, § 210) and, except as otherwise provided by statute, admissible (Evid. Code, § 351).

We disagree with defendant's contention that the evidence of this phone call should have been excluded under Evidence Code section 352. "Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in [Evidence Code] section 352. [Citations.] [¶] Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

The potential prejudice presented by this evidence, according to defendant, was that it described violent conduct, was inflammatory, and would tempt the jury to find the gang enhancement allegations true on improper bases. However, there was no evidence that anything was actually done to the wayward gang member. In our view, the evidence was no more inflammatory than other admissible gang evidence in general. We conclude that the probative value of this evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352; *Holford, supra*, 203 Cal.App.4th at pp. 167-168.)

Defendant principally relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved on other grounds in *Vang, supra*, 52 Cal.4th at pages 1047-1049 and footnote 3. In *Killebrew*, the court first determined that certain gang expert opinion testimony was improperly admitted because the expert "testified to the subjective *knowledge and intent*" of certain alleged gang members by testifying that each of the alleged gang members knew there was a gun in one of the cars and jointly possessed the

49

gun with every person in each of the three cars for their mutual protection. (*Killebrew*, at p. 658.) The court in a separate discussion part went on to address the bases for the expert's opinion, noting that the expert, Darbee, opined that each of the 12 men arrested was a gang member, "and stated that he based his opinion on review of criminal records, Bakersfield Police Department records, photographs of the men, the color of the clothing they wore that night, the people with whom they associated, his training and experience, and conversations with gang and nongang members of the community. Darbee then spent over 100 pages of transcript explaining in detail why he believed each man was a gang member. This testimony varied from convictions, to arrests without convictions, to pure speculation." (*Id*. at p. 659.) The court highlighted what it found to be particularly egregious testimony about a juvenile containing numerous allegations not supported by evidence of any arrests, trials, convictions, or juvenile petition true findings. (*Ibid*.) The court concluded: "The trial court abused its discretion by allowing Darbee to testify at such great length about material that inflamed the jury's passions and had little or no probative value." (*Ibid*.)

Relevant to the jail phone conversation at issue, virtually none of these concerns are present. The statements were made by defendant himself, and did not constitute unsubstantiated accusations or speculation. The evidence was relevant, and it was not particularly inflammatory. We conclude that the trial court did not abuse its discretion in admitting that evidence. (*Doolin, supra*, 45 Cal.4th at p. 437.) Moreover, even if it was error under Evidence Code section 352 to allow this testimony, we conclude any such error is harmless. The other evidence establishing the charged offenses and the gang enhancement allegations was abundant and the violence implied in this conversation did not tip the balance.

### 4. The Remaining Challenged Testimony Concerning Violence

Considering the relative strength of the admissible evidence supporting the jury's verdicts on the charged offenses and the true findings on the gang enhancements and the

lack of any evidence supporting a different outcome, we conclude that there is no reasonable probability that if the jury had not heard Shelton's testimony concerning the predicate offense involving defendant and his activities while incarcerated pending trial, defendant would have achieved a more favorable result. (*Beltran, supra*, 56 Cal.4th at p. 956; *Watson, supra*, 46 Cal.2d at p. 836.) None of the testimony about which defendant complains here was crucial to the jury's determinations as to the charged offenses or the gang enhancements. We conclude that any error in admitting this evidence was harmless.

## IV. Defendant Was Not Denied the Effective Assistance of Counsel Based on the Failure to Request CALCRIM No. 1403

### A. Additional Background

At one point during Shelton's testimony about the East Side Pirus and gangs in general, the trial court interjected as follows: "When you have an expert, experts are allowed to testify to what commonly referred to as hearsay testimony. This is a good example just then of the detective said he wasn't there at the meeting [of gang members], he has been told about this type of meeting. [¶] And, so, for an expert, hearsay is permitted as testimony, so if it helps to form the basis of the opinion. It's not being offered for the truth of the matter, but to formulate an opinion, the basis for the opinion. [¶] I know that's -- again, we are saying this to sort of folks not trained in the law, but it has an evidentiary significance, and you will see that as we move along."

At the conference on jury instructions, defendant's trial counsel did not request that the court instruct the jury with CALCRIM No. 1403.[18]

---

[18] CALCRIM No. 1403 instructs: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] [The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related (crime[s]/ [and] enhancement[s]/ [and] special circumstance allegations) charged(;/.)] [¶ [OR] [¶] [The defendant had a motive to commit the crime[s] charged(;/.)] [¶] [OR] [¶] [The

51

The trial court did instruct the jury with CALCRIM No. 303 on the limited purposes of evidence in general, as follows: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." The court then provided the jury with an example, stating, "For example, when I instructed all of you that there was hearsay that was being testified to by the gang expert, that that was to ultimately be considered for going to the basis of his opinion, not for the truth of the matter. That is limited purpose evidence."

## B. Defendant's Contentions

Defendant asserts that the trial court erred in failing to instruct the jury sua sponte with CALCRIM No. 1403. He contends that this is the type of "extraordinary case" that required the court to instruct the jury with CALCRIM No. 1403 sua sponte even though there is ordinarily no duty to give this instruction absent a request. He asserts that, in the absence of the limiting instruction, the jury was more likely to find the gang enhancement allegations true regardless of whether the evidence actually established that the crimes were gang-related.

## C. Limiting Instructions, Duty to Instruct Sua Sponte, and Forfeiture

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . .' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.)

---

defendant actually believed in the need to defend (himself/herself)(;/.)] [¶] [OR] [¶] [The defendant acted in the heat of passion(;/.)] [¶] [OR] [¶] [ *<insert other reason court admitted gang evidence>*.] [¶] [You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.] [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that (he/she) has a disposition to commit crime."

" 'When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 (*Hernandez*), quoting Evid. Code, § 355.) "Thus, although a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*Hernandez*, at p. 1051.)

Defendant did not request that the trial court instruct the jury with CALCRIM No. 1403. Thus, as a general matter, defendant forfeited his contention. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 [trial court was under no sua sponte duty to give an instruction as to limited purpose of evidence; the defendant's failure to request such an instruction forfeits the claim of error on appeal]; *People v. Clark* (2011) 52 Cal.4th 856, 942 (*Clark*) [failure to request instruction concerning limited purpose of expert testimony resulted in forfeiture].)

As defendant states, our high court in *People v. Collie* (1981) 30 Cal.3d 43 (*Collie*) recognized "a possible exception" to the general rule that a court has no sua sponte duty to instruct on the limited use of evidence. (*Hernandez, supra*, 33 Cal.4th at pp. 1051-1052.) That possible exception may arise "in 'an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and *minimally relevant* to any legitimate purpose.' " (*Ibid*., quoting *Collie*, at p. 64, italics added.) *Collie* was not a gang case. It involved a domestic violence murder where the defendant complained the trial court should have instructed the jury sua sponte on the limited admissibility of evidence of previous assaults committed by defendant against the victim, his wife. (*Collie*, at p. 63.)[19]

---

[19] *Collie* predated the STEP Act by a decade and predated Evidence Code section 1109 concerning the admissibility of prior domestic violence evidence by some 16 years.

The gang evidence presented by the prosecution here was, indeed, a "dominant part of the evidence against the accused . . . ." (*Collie, supra*, 30 Cal.3d at p. 64), but this was permissible given the elements of the gang enhancement. In our view, like *Hernandez*, this is not the "extraordinary case" contemplated in *Collie*. (See *Hernandez, supra*, 33 Cal.4th at pp. 1051-1052.) While the gang evidence was, indeed, a focal point of the prosecution's case, the subject evidence was not "minimally relevant to any legitimate purpose." (*Ibid*.) "All of the gang evidence was relevant to the gang enhancement, which was a legitimate purpose for the jury to consider it. Accordingly, the trial court must give a limiting instruction on evidence admitted to support the gang enhancement only on request." (*Id*. at p. 1052, fn. omitted.)

Additionally, the gang evidence was relevant to defendant's motive for possessing the firearm and the two controlled substances for sale. Evidence of gang membership, defendant's position in the gang, whether defendant committed his crimes for the benefit of or in association with a gang, and with the specific intent to promote, further, or assist in any criminal conduct by gang members, were matters central to the prosecution's case. (See *People v. Woods* (1991) 226 Cal.App.3d 1037, 1054 [evidence of gang membership critical to prove motive of retaliating for death of fellow gang member and intent to kill, and therefore was central to the case; the court had no sua sponte duty to give instruction limiting the jury to only consider evidence of appellant's past gang membership for purposes of proving intent to kill or motive].)

Moreover, we do not consider the subject evidence to be "highly prejudicial." In discussing prejudice within the meaning of Evidence Code section 352, our high court has repeatedly stated, " '[t]he prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant,

---

While we address the merits of defendant's argument based on *Collie*, we do not endorse the continued viability of *Collie* after the enactment of these statutes.

54

highly probative evidence.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) Rather, *undue prejudice* arises with evidence that " ' "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." ' " (*People v. Jones* (2012) 54 Cal.4th, 1, 61.) Again, the inadmissible evidence was not any more inflammatory than the admissible gang evidence; it did not uniquely evoke an emotional bias.

This not being the "extraordinary case" contemplated by *Collie*, the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 1403 in the absence of a request. Thus, defendant forfeited the issue. (*Clark, supra*, 52 Cal.4th at p. 942.)

### D. Ineffective Assistance of Counsel

Defendant contends that, if his contention has been forfeited, he was denied the constitutionally effective assistance of counsel by his attorney's failure to preserve the issue. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].) The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.)

Where we can dispose of an ineffective assistance of counsel claim on the grounds of prejudice, we need not address whether counsel's performance was deficient. (*In re Fields* (1990) 51 Cal.3d 1063, 1079; *People v. Smith* (2011) 198 Cal.App.4th 415, 428 [no need for the reviewing court to determine whether the failure to request a pinpoint instruction was deficient because, even if it was, the failure to request the instruction did not prejudice defendant].) To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

We conclude that there is not a reasonable probability that, if defense counsel had requested CALCRIM No. 1403, defendant would have achieved a more favorable result.

## V. Cumulative Prejudicial Error

Defendant asserts that the judgment should be reversed due to cumulative error. According to defendant, the cumulative effect of multiple errors deprived him of his due process right to a fair trial. We reject this contention.

The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) Any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have concluded that certain of defendant's claims of error are without merit.

56

In parts II. and III. of the Discussion, *ante*, we have found any error nonprejudicial. We have reviewed all of defendant's claims and find no cumulative prejudicial error warranting reversal. Defendant was not deprived of a fair trial.

## VI. In Camera Hearing and Evidence Code Sections 1040 and 1042

In its in limine motions, the prosecution sought to preclude the defense from pursuing a certain line of questioning, stating that, if such questioning occurred, the testifying detective would invoke the privilege under Evidence Code sections 1040 and 1042.[20] During an evidentiary hearing held in limine, defense counsel was permitted to

---

[20] Evidence Code section 1040 provides in pertinent part: "(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made. [¶] (b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and either of the following apply: [¶] … [¶] (2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ."

Evidence Code section 1042, subdivision (d) provides in pertinent part: "(d) When, in any . . . criminal proceeding, a party demands disclosure of the identity of the informant on the ground the informant is a material witness on the issue of guilt, the court shall conduct a hearing at which all parties may present evidence on the issue of disclosure. Such hearing shall be conducted outside the presence of the jury, if any. During the hearing, if the privilege provided for in Section 1041 is claimed by a person authorized to do so or if a person who is authorized to claim such privilege refuses to answer any question on the ground that the answer would tend to disclose the identity of the informant, the prosecuting attorney may request that the court hold an in camera hearing. If such a request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel. At the in camera hearing, the prosecution may offer evidence which would tend to disclose or which discloses the identity of the informant to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial. A reporter shall be present at the in camera hearing. Any transcription of the proceedings at the in camera hearing, as well as any physical evidence presented at the hearing, shall be ordered sealed by the court, and only a court may have access to its contents. The court shall not order disclosure, nor strike the testimony of the witness who invokes the privilege, nor dismiss the criminal

57

pose several questions to Shelton concerning what information, if any, he had that led him to encounter defendant on the night of his arrest. Shelton invoked the Evidence Code section 1040 and 1042 privilege as to each of these questions.

Thereafter, the trial court conducted an in camera hearing with only Shelton.[21] The trial court found that Shelton properly invoked the Evidence Code sections 1040 and 1042 privilege and ruled that the nondisclosure of information revealed during the in camera hearing would not deprive defendant of a fair trial. The court denied defendant's oral motion for disclosure of information based on Evidence Code sections 1040 and 1042.

Defendant now requests that we review the transcript of the in camera hearing to determine whether Shelton was entitled to withhold evidence pursuant to Evidence Code sections 1040 and 1042, whether the evidence was discoverable, whether the court properly concluded that the material was privileged, whether the evidence should have been disclosed to the defense, and whether it contained *Brady*[22] material. The People do not oppose defendant's request.

" 'A public entity has a privilege to refuse to disclose official information' [citation] if '[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . .' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1059, quoting Evid. Code, § 1040, subd. (b).) A trial court has discretion to deny

---

proceeding, if the party offering the witness refuses to disclose the identity of the informant, unless, based upon the evidence presented at the hearing held in the presence of the defendant and his counsel and the evidence presented at the in camera hearing, the court concludes that there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial."

[21] The prosecutor was not present during the in camera hearing.

[22] *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*).

disclosure "when the necessity for confidentiality outweighs the necessity for disclosure . . . ." (*Suff*, at p. 1059.)  "The trial court's ruling is reviewed under the abuse of discretion standard."  (*Ibid.*)

Regarding the materiality of the assertedly privileged information, courts have held that " '[T]he test of materiality is not simple relevance; it is whether the nondisclosure might deprive defendant of his or her due process right to a fair trial.' " (*People v. Lewis* (2009) 172 Cal.App.4th 1426, 1441; *People v. Garza* (1995) 32 Cal.App.4th 148, 153.)  As defendant appears to concede, if a court concludes that information should have been disclosed, the failure to do so is not prejudicial unless there was a reasonable probability of a different outcome had the evidence been disclosed. (See *Brady, supra*, 373 U.S. at p. 87; see *Kyles v. Whitley* (1995) 514 U.S. 419, 433-434 [131 L.Ed.2d 490]; *People v. Gaines* (2009) 46 Cal.4th 172, 183-184 [applying the *Brady* standard to determine prejudice for failure to provide *Pitchess* discovery].)

We have reviewed the reporter's transcript of the in camera hearing and conclude that the trial court did not abuse its discretion in rejecting disclosure of the information defendant sought.  We further conclude that there was not a reasonable probability of a different outcome had the information been disclosed.

### VII.  Fines and Fees

In reviewing this case, we have noticed an error on the abstract of judgment.  In sentencing defendant, the trial court orally imposed $2,100 for both the restitution fine (§ 1202.4, subd. (b)) and the parole revocation restitution fine (§ 1202.45).  However, the abstract of judgment incorrectly sets forth the amounts imposed for each of these fines as $1,200.  "[T]he abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict." (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070.) Thus, these amounts must be corrected on the abstract of judgment.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment reflecting the $2,100 orally imposed for the restitution fine (§ 1202.4, subd. (b)) and the parole revocation restitution fine (§ 1202.45).  The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

/s/

MURRAY, J.

We concur:

/s/

RAYE, P. J.

/s/

RENNER, J.